but we will start with the first case, which is Gung versus City University of New York. Docket number 20-1341. Let me just make sure that we have both counsel here and they're both can see and hear us and that we can hear them. So for the petitioner appellant, we have, is it Mr. Coppell? Yes, Oliver Coppell. Good morning, your honor. Coppell, Mr. Coppell, thank you. And we can hear you. And then for the respondent or the appellee, we have Mr. Del Pozo. Yes, good morning, your honor. Okay, welcome. So for the appellant, I understand that you've reserved three minutes for rebuttal. Is that right? Yes, that's correct, your honor. Very good. So why don't you please proceed? Yes, good morning, your honor. All three honorable judges. May it please the court. Of course, I'm Oliver Coppell. I represent Professor Honigman Gung, a professor at Hunter College who claims she was injured as a result of discrimination. And there were two decisions of the lower court that I'm sure the court is aware of. The first was on 12B6, a direct motion to dismiss without any consideration of other than the evidence presented in the complaint and the allegations of the complaint. And I think it's worthwhile, although I know your honors are well aware of the standards for discrimination, but she cites the standards and then goes on to violate her own standard setting. And I think it's worth reading quickly what she quotes. She quotes from cases, earlier cases. Facts required to be alleged in the complaint need not, not give plausible support to the ultimate question of whether the adverse employment action was attributable to discrimination. The facts need only give plausible support to a minimal inference of discriminatory motivation. And the judge says, why that's so? That's because employers usually don't state their intent to discriminate. It's an unstated intent and state of mind and rarely is there direct smoking gun evidence of discrimination. Rather plaintiffs must rely on bits and pieces of information to support an inference of discrimination, a mosaic of intentional discrimination. Even if the actions independently alleged do not constitute adverse employment actions, they may provide relevant background experience, evidence of defendants motivation. And that's the case here. Now, shockingly and really shockingly, Judge Schofield misreads the complaint when she states on page 11 of her first opinion that the complaint does not tie the negative allegations of department chair Allen Fry to Dr. Gong's race or national origin or alleged that such actions were motivated by plaintiff's membership in a protected class. That's simply false. Look at page four of the complaint. Page four of the complaint, paragraph 23, specifically states- I'm sorry, Mr. Cabal, when you refer to the page numbers, could you direct us to the page in the appendix so that we can follow along with you? Yes, the complaint page in the appendix is joint appendix 79. And I'm sorry, wait a minute. That's, hold on a moment, please. That's the opinion. That's page 11 of the opinion. It's joint appendix 79. And then if we go to the complaint, and that's page four of the complaint, that's joint appendix 36. Joint appendix 36. And there it states specifically, plaintiff was up for promotion. However, he attempted to block Dr. Fry, attempted to block the promotion due to discriminatory animus by including a damaging memorandum and addendum to her application. Plaintiff was again required to file a complaint with Hunter College's Office of Diversity and Compliance. As a result, as a result of that, Dr. Fry withdrew the addendum and her promotion was approved. So when Judge Schofield says that there's no allegation that Dr. Fry acted out of discriminatory animus, that's false. That's simply false. Furthermore, if you look further, remember she says in citing there has to be a mosaic, a mosaic showing discriminatory intent. And what is the mosaic that's alleged specifically in the complaint? She faced grave obstacles to promotions and it took her longer than the other faculty members to gain the two promotions she gained to full professor. There were inappropriate teaching assignments. When you say that, does it juxtapose her to others, others who were not of her national origin? I mean, it just says that other, oh, wait a second, wait a second. Does it compare her to Caucasians? It doesn't. Does it compare her to those of Caribbean nationality? It just says it took her longer than others. It doesn't juxtapose her to some kind of reference group, does it? Well, I think by saying it took longer than others, the implication is clear. What if the others were of Korean descent? Those of Korean descent got to full professorship shorter than she did or 10 years shorter than she did. Would that imply, excuse me, would that imply discriminatory animus? If it was because she was Chinese, yes, certainly. But it's not only one thing. We can go to other things. Inappropriate teaching assignment changes. She cites specifically, she was assigned to teach Chinese geography, even though she's an American geography specialist, and she was assigned to that because she's Chinese. She was exposed to hostile commentary. Again, that hostile commentary had to do with China and made her uncomfortable as of Chinese extraction. What was the hostile commentary? Was that commentary upon China's actions in the South China Sea? Yes, it had to do with that. So if you are of Chinese descent, no one can speak ill of the country of China's politics in front of you? Well, she was- Without giving rise, excuse me, giving rise to an inference of some sort of discrimination? I'm sort of baffled by that. She indicates that it was a policy in these general discussions of the faculty not to take on subjects that were political or embarrassing- What if it had been about the systematic incarceration of the Uyghurs and the requirements that they give up their faith? Would that have been discriminatory? It might have, given the fact that this was not a political discussion and that political discussions that could be deemed to be embarrassing or uncomfortable to members of the faculty, and that's what she recites. Then I would say that- No, in the geography department, you can't talk about current events because it might be embarrassing to someone who is of the same, I suppose, ethnic origin as a particular country under discussion. Is that the thought? The thought was that in these discussions, because this had apparently nothing to do with the direct subjects being taught, that you stay away from subjects that could be embarrassing, and she indicates that this was particularly embarrassing to her and was engaged in, notwithstanding that, in fact, engaged in in preference to her being able to talk about the subject that she had prepared for this conference. Mr. Capel, I have a question, Judge Walker. What impresses me about this complaint is that it seems to reflect subjective sensitivities on the part of your client without necessarily meeting objective standards. I mean, what we've been discussing now are relatively innocuous events and occurrences. There needs to be some kind of evidence that directly shows some sort of discriminatory mosaic other than her feelings and her sensitivities about certain things that have happened. Well, remember, the gravamen of the complaint is that she was removed from two positions. She was removed as faculty advisor and as a scholarship coordinator. Those two actions were engineered by Professor Fry, the head of the department, and we show in the earlier actions that this Professor Fry had discriminatory animus against her, that he acted against her interests because he felt hostile to her Chinese origin. And to her being Chinese and treated her unfairly. And we go back to those earlier examples. You take each example individually, Your Honor, you're right. If you just look at the one individual example, perhaps it doesn't rise to the level of discrimination. But if you look at the panoply of treatment that she received over a decade at Hunter College, one can see that she was disadvantaged and there are evidences in the examples shown that that disadvantage was due to discrimination. Again, this is a pleading motion. I think you've reserved, sir, you've reserved three minutes for rebuttal. You may use that time now if you'd like, or you may hold that in reserve. I'll give you the option. I will just conclude by saying that on the second dismissal, there was clear conflict as to when the CUNY knew and when the department knew that she had filed a complaint with the EEOC. And given that conflict of evidence, it should not have been a summary judgment dismissal. Okay, thank you. You've reserved three minutes for rebuttal. Why don't we hear from the appellee? Good morning and may it please the court. Eric Del Pozo for the City University of New York for CUNY. The judgment for CUNY should be affirmed. The district court properly dismissed Professor Gong's discrimination claims and then disposed of the remaining retaliation claim on summary judgment. I'll address the claims in order, but when my two minutes have passed, I'm happy to answer whatever questions this court has. The district court properly held that the complaint failed plausibly to plead that CUNY's removal of Professor Gong's duties as graduate advisor and fellowship coordinator was based on her race or national origin. There's no allegation of direct animus, such as slurs or things of that nature. And as the district court properly held, even considering all of the allegations together, the complaint fails to give rise to this plausible mosaic of intentional discrimination. What we have are a miscellany of alleged events facially unconnected to each other over the course of the decade. Some before Dr. Fry had even entered the scene in 2013 under a different departmental chair. Many of them rely on comparators, whether receiving an allegedly untimely promotion, being made to hold evening office hours, being made twice in two decades to teach a particular course. But there was no detail whatsoever about these comparators. To be viable comparators, a fellow employee has to be similarly situated in all material respects. Presumptively, Professor Gong knows who her colleagues were, who was teaching office hours when, who was promoted when. The geography department is not that large. It's a couple of dozen professors. But all of this information is missing from the complaint. It states only, in essence, that other professors were treated differently. If that were enough to survive a motion to dismiss, the pleading standards would be gutted. For the discrimination claim, I'll also address this allegation that Professor Fry attached a damaging memorandum to Professor Gong's application for full professor in 2014. We'll assume that that's true as we must on a 12B6, but the complaint doesn't specify at all what the content of that memorandum was, what Professor Gong's, the substance of Professor Gong's complaint to the diversity office. It could have been about any of a number of topics. As the district court correctly held, it takes speculation to link those events to Professor Gong's protected traits. The request to amend the complaint, which my adversary, Mr. Coppell, didn't mention, is plainly forfeited. Professor Gong had every opportunity to amend the complaint. This case is quite unlike Cresci against Mohawk Valley in which the district court was faulted for dismissing the entire complaint, barring amendment preemptively in that opinion, and then entering judgment the same day. Here, the district court dismissed some of the complaint, two of the three claims, and then held two status conferences over the course of two months about discovery leading up to summary judgment motions at which Professor Gong could have, but did not seek amendment. And we're in the somewhat unique position of having had discovery on many of the issues that we're now talking about in the abstract on this fall B-6. And a glance at that evidence, I think precludes any sense that Professor Gong could plead a viable discrimination claim still now. She does not identify what additional allegations she would include in this complaint, and I think that absence is telling and noteworthy. As for the hostile work environment claim, the complaint alleges just the ordinary incidents of the functioning of an academic department over a decade. There were no slurs, no off-color jokes, no additional or demeaning tasks, nothing that would give rise to an inference of an objectively severe and continuous hostile work environment. Maybe Professor Gong took offense to some of these perceived slights, as Judge Walker's question alluded to, but that's not enough for the hostile work environment standard, which needs to be objectively severe. Only two of the allegations, even nominally related to Professor Gong's protected status or national origin, one that she was asked twice over two decades to teach a particular course, which plausibly suggests at most that sometimes the department needed somebody to teach this course. The latter instance was when, as the complaint alleges, one of her courses was canceled. It's certainly not hostile. They ask a professor to teach a full course load by swapping in a different course. And the other allegation, nominally relating to Professor Gong's national origin, was this faculty presentation about China's territorial activities, perfectly appropriate for a geography department to be discussing geopolitical events. There was no allegation, as the district court correctly held, that the presentations themselves were derogatory in nature or objectively hostile in any way, and this court, I think, understands, or should understand that it should be very wary about inferring workplace discrimination from ordinary academic presentations, objectively inoffensive academic presentations within a university. If there are no questions about the discrimination claim or the hostile work environment claim, I will move to the retaliation claim, address that briefly. The district court properly held that no reasonable jury can infer retaliatory intent on this record. It is unclear, as an initial matter, who is alleged to have done the retaliating. The complaint is unclear about that. The briefing on appeal is equally unclear about that, whether the appeals committee or Dean Haddad or Professor Dr. Fry. No matter who it was, the complaint fails to meet either the step one or step three burden under the framework. The undisputed evidence shows that CUNY received the notice of charge, that the notice of charge was sent by the EEOC and stamped as received by CUNY only after the personnel and budget committee had reached the challenge decision, precluding any showing of causation, and to the extent that Professor Gong now wants to pivot and say no, it was a prior informal conversation that she had with another fellow professor. The district court properly declined to entertain that. Theory is both belated and unsupported by admissible evidence that any relevant decision maker was privy to that alleged conversation with a fellow professor. And finally, Professor Gong has not raised a triable issue of pretext that CUNY's legitimate, in light of CUNY's legitimate reasons for removing her responsibility as a graduate advisor and fellowship coordinator. It was based on an administrative post-investigative finding that Professor Gong had leveraged her roles in those respects to extract unrelated work from a graduate student whose fellowship payment she withheld. And that finding was upheld by a college-wide committee headed by the provost. And then at that point, Professor Gong files her, or goes to the EEOC, complains of discrimination. The CUNY, the college doesn't learn about that until after the personnel and budget committee has reached its decision. And it was essentially simply implementing the directive of the highest academic officer at CUNY. If this court had- What do you make of the, your opponent alluded to the fact that he thinks there's an issue of fact as to that timing issue? I know, I have a couple of questions for you. Number one, I don't see a signed copy of the EEOC complaint from Professor Gong in the record. Is there such a document? Have you been provided with such a document? It's not in the record and we did look in our files and we don't have it in our files either. So the only evidence here is the notice of charge. And the notice of charge is timestamped, what is it, October? October 3rd. October 3rd. And the decision is October 2nd, is that right? The decision by the personnel and budget committee was actually September 27th. 29th, okay. September 27th, received by a note, the copy of the decision or the result was transmitted to Professor Gong, I think on October 3rd. Okay, all right. The date of the EEOC notice, that the date on the EEOC notice is September 29, but your timestamp for receipt is October 3rd, right? That's right. Both of those dates are after the date on which the meeting minutes reflect that the personnel and budget committee reached its decision. Dean Haddad also testified that a search of CUNY's records didn't turn up any evidence of CUNY having prior knowledge of the complaint. But in any event, even if this court were to conclude that there were a triable issue of when CUNY received notice, there's still no triable issue of but-for causation. And so this discussion about the step one, showing, well, important and we think provides an independent ground for affirmance of the retaliation claim ultimately doesn't matter given the fact that Professor Gong hasn't raised a triable issue of retaliation. The most that she does in her briefing is cast dispersions on these meeting minutes and reports implying that they're fabricated. This is just classic speculation that can't survive a summary judgment. And I'll add the notion that the college provost of Hunter College would backdate or otherwise fabricate an official misconduct finding to mass retaliatory animus. It just doesn't pass the smell test. And even if this court were to disagree, it would require some admissible evidence to support that very bold assertion. Okay, thank you. Very good. Thank you very much. We appreciate your argument. Why don't we turn back to counsel for the appellant. Mr. Coppola, you have reserved three minutes for rebuttal. Right. First of all, on the first 12B6 motion, the complaint or the defect would seem to be a lack of adequate allegations with respect to comparators. That's what it comes down to. If I hear both the questions of the court and the argument of CUNY, that we didn't have in our complaint sufficient comparators in similar position to do to Professor Gongberg of different racial backgrounds. I would argue that there were sufficient comparators when she says that it took her longer to get her promotions than others. She's comparing herself to others. Well, what if the others were also Chinese? Well, if the others were also, but- No, excuse me, Mr. Coppola. If they were Chinese, how does one infer then that her nationality was a reason why she waited longer if her others were similarly situated or of the same nationality? What, how does one possibly draw that inference from that? Well, I would suggest this, that the case should have permitted to proceed and then evidence could have been presented by CUNY, evidence could have been presented by CUNY that other Chinese were similarly adversely affected. The duty is on you to plead the comparators. The duty is on you, excuse me. The duty is on you to plead the comparators, not for them to say that there were other comparators and then they produce who the comparators were, isn't it? I think that is our duty to plead that she was differently treated. If the issue is, if that becomes an issue of conflict that can be determined after summary judgment or after trial, it's necessary for us to plead that she was adversely treated and we do plead that. But, and let me say that there are other examples. In one example, her course, she was taken off teaching a particular course and a less qualified instructor was substituted. Again, you've got to look at all these things. You can't look at one. Maybe the one, the lack of promotions is not sufficient, but I would like to say that if this pleading defect was the problem, she should not, the case should not have been dismissed. She should have been given the permission, the permit to replead. And what happened here- Did you ask for that? No, but the scheduling that was, as we discussed in our brief, the scheduling made it really impossible. Let me also say one other thing with respect to the retaliation claim. The original recommendation before the budget committee took it up was merely to change procedures, not to remove her. They removed her after they got noticed that she filed the EEOC complaint. That's the but for. If they had merely reflected Dean Haddad's recommendation, we couldn't complain. But what happened is they went further than they really were permitted to go. And that's discussed in the brief. And they removed her after they learned about the EEOC complaint. There is a but for. Now, obviously, if they didn't know about the complaint, they couldn't have done it because of the complaint. But we say that there's significant question as to when CUNY learned of the filing, because the rules of the EEOC were that it should have been noticed to CUNY in 10 days. And that 10 day notice would have come before the budget committee made its decision. Is there a presumption of regularity with regard to the date that appears on the notice that came from EEOC recognized under New York law and federal law? I frankly, there is, I believe there is. It would be your obligation to rebut it, have you? We have alleged that the committee knew prior to its decision. We alleged that the committee knew and we think that the ruling, the regulations of the EEOC indicate that CUNY in one form or another, maybe not by that notice, but in one form or another, CUNY, the committee knew, the budget committee knew that she had filed the EEOC complaint. We also have that evidence of Presser Ahern. You can say, I think that's subject to question of credibility. Do you believe it or you not believe it? There's enough question that this should not have been dismissed on summary judgment. Thank you. Unless there are any further questions from the other judges, we'll take the case under advisement. Thank you very much to both of the council for their arguments today. We greatly appreciate it. Thank you.